IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**CASEY MCCORMICK**,
an individual,

                               Lead Case No. 3:14-cv-01128-MO

             Plaintiff,                      No. 3:14-cv-01131-MO

         v.                                 OPINION AND ORDER

**CABLE COMMUNICATIONS, INC.**,
a foreign corporation,

             Defendant.

**MOSMAN, J.**,

       Plaintiff Casey McCormick and Defendant Cable Communications, Inc. ("CCI") have

filed competing motions for summary judgment. Mr. McCormick's Motion for Partial Summary

Judgment [26] seeks summary judgment regarding his Fair Labor Standards Act ("FLSA") claim

and his ORS 652.140 claim for failure to pay all wages at the end of employment. CCI's Motion

for Summary Judgment [29] seeks summary judgment regarding all of Mr. McCormick's claims.

For the reasons set forth below, Mr. McCormick's Motion for Partial Summary Judgment [26] is

DENIED and CCI's Motion for Summary Judgment [29] is GRANTED in part and DENIED in

part.

## BACKGROUND

       CCI is a cable installation company. It employs technicians to install cable television and

internet services for Comcast. *See Deposition of Casey McCormick ("McCormick Depo."),*

1 – OPINION AND ORDER

40:8–24 (describing his duties and the work performed by CCI). Mr. McCormick started

working at CCI in April of 2013. *Id*. at 38:1–13.

      At the start of his employment, CCI gave Mr. McCormick a document explaining how

technicians were paid after they completed their hourly paid training program. *McCormick*

*Depo.*, 31:24–32:7. For each task the technician performs during the week there is a dollar value

assigned to it. At the end of the week all the task values are added up to get to a total dollar

amount – the "Piece Rate Total." Then it is determined whether the employee performed any

work in excess of 40 hours during the pay period. If so, the total amount of hours worked is

divided into the Piece Rate Total to determine the average hourly rate. The technician is then

paid a "Piece Rate OT Premium" on that rate for all hours over 40. The Piece Rate Total is then

divided by 60 and multiplied by 70 and then the Piece Rate Total is subtracted back out of this

number to come up with a total amount available for the "Production Bonus." If an employee

was paid overtime for that week, Piece Rate OT Premium is also subtracted from the preliminary

Production Bonus calculation. At that point, a Production Bonus is finalized and paid to the

employee. If the employee worked overtime that week, then they are also paid overtime wages.

This is all explained in the Technician Pay Rate Program given to Mr. McCormick, which he

signed stating that he read it, had a chance to ask questions to his satisfaction, and understood

how it worked. *Id*. The upshot of all these calculations, at least for our purposes, is that

Mr. McCormick's Piece Rate OT Premium was subtracted from his bonus before his overtime

wages were calculated.

      After the hourly paid training program (which Mr. McCormick testifies is not a part of

his wage claim, *Id.* at 39:3–40:1), technicians, such as Mr. McCormick, fill out daily work sheets

("Daily Sheets") to indicate how many hours they worked and which tasks they performed.

*Baker Declaration* [39], ¶ 5, Ex. C (Daily Sheets for the week ending September 28, 2013). Each

day Mr. McCormick filled out one of these sheets and signed it stating "I hereby certify that the

tasks completed, mileage driven, and hours worked as indicated are true and complete. I have

received all rest breaks and meal periods to which I was entitled." *Id*. Mr. McCormick

specifically testified at his deposition that he filled out these Daily Sheets truthfully every day

and that he believed it was fair for CCI to rely on his representations as to the information he

provided. *McCormick Depo.*, 41:5–24. At the end of each week, Mr. McCormick would be given

a "Weekly Payroll Report" showing the hours he worked and the amounts, including overtime

that CCI calculated was due to him based on the work he performed. *Baker Declaration* [39],

¶ 6, Ex. D (Weekly Payroll Report for the week ending September 28, 2013). It was from these

sheets that CCI would cut the checks to employees.

   Mr. McCormick was required to review the Daily Sheets and the Weekly Payroll Reports

and sign off indicating that they were accurate before the checks were cut. The Weekly Payroll

Report provided, "I certify that the time and mileage below accurately reflect the hours worked

and miles driven this week for the jobs below and that I received all 30 minute meal periods to

which I was entitled." *Id*. Mr. McCormick testified that he signed each of these Weekly Payroll

Reports and that he would not have signed them if they were not accurate. *McCormick Depo.*,

51:23-52:6. He also testified that if he worked overtime he was paid for overtime and signed

Weekly Payroll Reports indicating that he was paid overtime. *Id.*

   On December 31, 2013, at around 11:30 PM, Mr. McCormick had a pseudo-aneurysm in

his abdomen that required surgery and time off work to recover. *McCormick Depo.*, 67:20–

68:16. Mr. McCormick's mother informed CCI about his hospitalization, and she was given the

Oregon Family Medical Leave Act  ("OFLA")/Family and Medical Leave Act ("FMLA")

paperwork to fill out on her son's behalf. *Id*. at 68:23–71:20. His OFLA/FMLA leave was approved. *Id*. However, shortly before his leave was about to end in February, he called in and asked if he could have some extra time. *Id*. at 76:21–78:8. CCI gave him the requested additional time, without requiring him to produce additional medical support for it. *Id*. Mr. McCormick testified that CCI was supportive and accommodating, and that he did not feel that anyone was discriminating against him for taking leave. *Id*.

When Mr. McCormick returned to work around March 2014, he claims he requested that his work schedule be limited to 8-hour days, 40-hour work weeks, and not more than 5 work days per week due to his injuries. *McCormick Depo.*, 73:14–74:23; 83:11–25; 88:8–89:6; 91:10–94:17; *McCormick Decl.* [27], ¶ 12. According to Mr. McCormick, his supervisor, Travis Smith, assured Mr. McCormick that his schedule would be limited as he requested. *Id.* at 73:14–74:23; 83:11–25; *McCormick Decl.* [27], ¶ 12; *and Baze Decl.* [28], Ex. 5 (showing Mr. McCormick's overtime worked in March 2014); Ex. 3 at 3–6 (same). No evidence in this case suggests that CCI ever requested Mr. McCormick to fill out or submit any further OFLA forms or other additional paperwork in regards to his request to be accommodated with a restricted work schedule due to injury.

Mr. McCormick claims that his request for a schedule accommodation was never implemented. *Id.* As a result, Mr. McCormick says he suffered pain and a further injury, aggravation, and/or re-injury approximately a month after his return to work due to work-related strain. *Id.* at 73:20–24; 78:9–11; 75:11–20. Mr. McCormick also required another visit to his surgeon as a result. *Id.* at 93:11–24.

Mr. McCormick alleges that he informed his supervisors that he was unable to work on April 5 and needed medical time off due to his injuries. *Id.* at 88:8–89:6; 91:10–94:17, 132:14–

17. Mr. McCormick also claims he specifically told his supervisors that he was suffering extreme pain in his side, that he needed to see his doctor, that he was only able to work a five-day work week during the week of April 5, and that he was unable to work a sixth day on April 5 because he needed to rest and recover from his injuries. *Id.* Mr. McCormick's supervisors were allegedly aware of his medical situation. *Id.* Mr. McCormick says he told his supervisor Travis Smith "that [his] side was hurting a whole lot . . . [Mr. McCormick] told [Travis Smith] that [he] needed a couple days to rest and to go to the doctor and see what was up, and [he] could finish that regular workweek. And that [he] would work five days out of the week." *Id.* at 88:14–20; 91:20–23. Mr. McCormick claims he informed three supervisors—Ries Thorne, Travis Smith, and Jeff Koffed—that he would not be able to work on April 5 because he was in severe pain from his injuries and needed to rest, recover, and arrange to see his doctor. *Id.* at 88:14–89:1; 91:10– 93:15. These three supervisors included both Mr. McCormick's weekend and weekday supervisors. *Id.*

Mr. McCormick returned to work for his scheduled shift on April 6 and worked his shift. *Id.* at 78:18–21; 94:15–95:17. Mr. McCormick was not reprimanded or disciplined when he returned to work on April 6, and he worked his shift without incident. *Id.* Mr. McCormick's supervisor, Travis Smith, was also at work on April 6 and Mr. McCormick talked to him. *Id.* at 94:22–95:8. When talking to Mr. Smith on April 6, Mr. McCormick "didn't get any warnings that something was weird [and] thought everything was fine." *Id.* On the following day of April 7, manager Jason VanNorstrand, acting for CCI, terminated Mr. McCormick. Def.'s Answer [5] at ¶¶ 7 & 36; *VanNorstrand Decl.* [30], ¶ 6; *McCormick Depo.* At 107:25–108:5.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, and other documents on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court views the record in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the movant shows that no genuine issue exists for trial, the non-movant cannot then rest on the pleadings but must respond by "citing to particular parts of materials in the record, including deposition, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1). When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989).

## DISCUSSION

### I.  Wage and Overtime Claims

The parties each seek summary judgment in their favor regarding Mr. McCormick's wage and overtime claims. Mr. McCormick argues that CCI's wage scheme violates the Oregon state law overtime regulations and the FLSA through a bonus structure calculated by subtracting overtime wages. Mr. McCormick further argues that these overtime violations resulted in a

violation of ORS 652.140 because he was not paid all the wages he was due at the time of his termination. CCI argues that it fully complied with the requirements of Oregon law and the FLSA, and what Mr. McCormick calls deficiencies in the bonus scheme are unregulated contractual agreements to which Mr. McCormick freely bound himself.

A.    *Oregon Overtime Regulation*

OAR 839-020-0030(1) commands that "all work performed in excess of forty (40) hours per week must be paid for at the rate of not less than one and one-half times the regular rate of pay when computed without benefits of commissions, overrides, spiffs, bonuses, tips or similar benefits." OAR 839-020-0030(3)(b)(A) provides the method for calculating the regular rate when an employee is paid based on a piece rate agreement: "[w]here an employee is employed on a piece-rate basis, the regular hourly rate of pay is determined by adding together the total earnings, (excluding commissions, spiffs, bonuses, tips or similar benefits) for the work week and dividing this sum by the number of hours worked in the week for which such compensation is to be paid." OAR 839-020-0030(3)(b)(B) makes it clear that, upon calculating the regular rate of pay, an employee paid based on a piece-rate agreement is entitled to receive an additional 50% of the regular rate for each hour worked over 40 in a week: "[f]or example, an employee who has earned $500 during a 50 hour work week must be paid an additional sum of $50 for the ten overtime hours, for a total of $550 (50 hours at $10 per hour and the ten overtime hours at $5.00 per hour)."

It is undisputed that CCI paid Mr. McCormick the required overtime pay for all the overtime hours he worked. All of Mr. McCormick's overtime pay related arguments have to do with his belief that his Piece Rate OT Premium should not have been deducted from his bonus; that doing so had the practical impact of diluting the value of his overtime pay. But Oregon law

does not require that bonuses be included in overtime pay calculations. And Oregon law leaves unregulated—that is it allows the parties freedom to contract with each other as they see fit—the payment of bonuses. Because Mr. McCormick has failed to make any legally significant arguments regarding the Oregon overtime pay regulations, CCI's Motion for Summary Judgment [29] regarding Mr. McCormick's First Claim is granted.

**B.**     *FLSA Overtime Provision*

Similar to the Oregon regulations, the FLSA provides that a piece-rate employee must be paid an additional 50% of his or her "regular rate" for each hour worked in excess of 40 hours in a single week. The "regular rate" is computed by "adding together total earnings for the workweek" and dividing that sum "by the number of hours worked in the week." 29 C.F.R. § 778.111. The only material difference between the Oregon and federal regulations is that the federal regulations require that all non-discretionary bonuses be included in earnings for the week, whereas the Oregon regulation does not. 29 U.S.C. § 207(e)(3). Expressed in a formula, overtime under the federal regulations is calculated as follows:

> **Regular Rate = (Piece Rate Total + Bonus)/Total Hours Worked**

> **Overtime Pay = 0.5\*Regular Rate\*(Total Hours Worked – 40)**

An important omission from the FLSA overtime provision is anything that attempts to regulate how bonuses should be calculated. 29 C.F.R. § 778.111. CCI calculates its employees' bonuses according to the following formula:

> **Bonus = 70\*(Piece Rate Total/60) – (Piece Rate Total + Piece Rate Premium for Overtime)[1]**

Mr. McCormick contends that this bonus scheme violates the FLSA. Mr. McCormick argues that by subtracting the Piece Rate Premium for Overtime from the Bonus before calculating the

---

[1] The Piece Rate Premium for Overtime is calculated according to the following formula:

**Piece Rate Premium for Overtime = 0.5\* (Piece Rate Total/Total Hours Worked)\* Overtime Hours Worked**

Regular Rate, CCI is illegally deflating the Regular Rate, the key input in the Overtime Pay formula, resulting in illegally depressed Overtime Pay amounts.

Mr. McCormick's briefing includes a mathematical example that shows that under CCI's bonus scheme the difference in pay between an employee who works 5 hours of overtime and an employee who works 10 hours of overtime is only $0.45. Pl.'s Motion for Partial Summary Judgment [26] at 5–8. What Mr. McCormick fails to appreciate, is that what he believes is an illegal failure to pay sufficient overtime wages is in fact a perfectly legal result of an agreed upon bonus scheme.

CCI does not dispute the fact that each hour of overtime worked decreases the bonus due, which has the effect of decreasing the Regular Rate, thereby decreasing the ultimate overtime payment that an employee receives. However, CCI correctly argues that the FLSA does not prevent employers and employees from contracting into whatever bonus scheme they desire. The only requirement imposed by the FLSA is that if CCI chooses to pay a bonus, it must include that bonus in its calculation of the Regular Rate. 29 C.F.R. § 778.111. Employers could contract into giving bonuses for showing up to work early and reducing bonuses for leaving early. Employers could contract into giving bonuses for good workplace behavior and reducing bonuses for bad workplace behavior, such as profane or abusive language. An employer could offer no bonus and not violate the FLSA. Employers who ask their employees to agree to substandard bonus structures will be punished by the market for laborers when their employees choose competitors who offer superior bonus schemes. The FLSA only requires that whatever bonus results from the agreed upon scheme, whether it be $1,000,000 or $0, be added to the employee's total compensation for calculation of the regular rate. In Mr. McCormick's illustration, each employee's overtime pay was calculated in exactly the manner mandated by the

FLSA. Both employees received the wages they were owed and they received the requisite overtime pay based on those wages. The fact that the employee who worked 5 additional hours only received an additional $0.45 was not a result of a failure to pay overtime, but rather the result of receiving a lower bonus than the other employee who worked fewer hours.

It is undisputed that CCI complied with the FLSA requirement regarding including bonuses in the weekly earning calculation. Mr. McCormick never alleges that CCI failed to include his bonus in the calculation of his overtime wages; he only argues that the bonus was illegally calculated. As stated above, the FLSA is not concerned with bonus payments beyond the fact that whatever bonus is paid must be included in calculating overtime payments. CCI did just that. I am neither a labor czar nor a majority of Congress and therefore lack the capacity to amend the FLSA to regulate employee bonuses to repair the holes Mr. McCormick argues exist in its overtime pay regulations. CCI's Motion for Summary Judgment [29] regarding Mr. McCormick's Second Claim is granted.

###### C.    *Late Payment of Wages*

Given my findings that Mr. McCormick was fully paid all overtime due under Oregon law and the FLSA, Mr. McCormick's claims that he was owed additional overtime payments at the time of his termination fall away. I find that Mr. McCormick was fully compensated upon his termination by CCI as required by ORS 652.140. CCI's Motion for Summary Judgment [29] regarding Mr. McCormick's Third Claim is granted.

## II.    Claims Arising from April 5, 2014 Shift Absence

CCI's Motion for Summary Judgment [29] also seeks to dispose of Mr. McCormick's Fourth Claim (Violation of the OFLA), Fifth Claim (Disability Discrimination), and Sixth Claim (Wrongful Termination). Each of these claims arises from Mr. McCormick's failure to work on

April 5, 2014. For the reasons set forth below, CCI's Motion for Summary Judgment [29] is granted as to the Fifth Claim and denied as to the Fourth and Sixth Claims.

A.    *OFLA Violation*

To prevail on his Fourth Claim, Mr. McCormick must prove that: (1) CCI is a covered employer with at least 25 employees; (2) Mr. McCormick is an eligible employee; and (3) CCI denied Mr. McCormick family medical leave to which he was entitled or retaliated against Mr. McCormick for requesting such leave. ORS 659A.183. In addition, under Oregon law, "It is an unlawful employment practice for an employer to count OFLA leave against an employee in determining the employee's compliance with attendance policies." OAR 839-009-0320(4). In other words, Mr. McCormick's claim survives summary judgment as long as he can show that he properly requested OFLA leave and was entitled to such leave for April 5, 2014. This would mean that CCI either improperly denied his leave request or that it held his medical leave against him when determining his compliance with attendance policies. Either of these situations would result in an OFLA violation.

It is undisputed that the first two conditions are satisfied in this case. CCI's briefing also lacks any arguments saying that Mr. McCormick would not have been entitled to OFLA leave had he properly requested it. CCI, however, argues that Mr. McCormick cannot show that he properly requested medical leave for April 5, 2014. CCI's entire argument is based on the fact that Mr. McCormick has no documentary evidence to support his claim that he requested medical leave. So the question becomes, how does one properly request medical leave under the OFLA? Specifically, is a person seeking OFLA leave required to submit any specific form of documentation to his or her employer?

OAR 839-009-0250 explains the type of notice an employee must give his or her employer prior to taking OFLA leave. Specific to this case, the regulation states, "When an employee is unable to give the employer 30 days notice but has some advance notice of the need for leave, the employee must give the employer as much advance notice as is practicable." OAR 839-009-0250(2). The notice must be given according to "the employer's known, reasonable and customary procedures for requesting any kind of leave, absent unusual circumstances." OAR 839-009-0250(1)(a). CCI would have the Court believe that its only known, reasonable and customary procedure for requesting OFLA leave is to submit the type of documentation to the company that Mr. McCormick had previously submitted in January and February of 2014 for his first stint of OFLA leave. Given that I must view the facts in the light most favorable to Mr. McCormick, I reject CCI's argument that submitting medical documentation was CCI's only acceptable means of requesting OFLA leave.

In his deposition, Mr. McCormick said he told Mr. VanNorstrand he had informed Ries Thorne and Jeff Koffed (the weekend supervisors) that he would not be at work on Saturday for medical reasons. *McCormick Depo.*, 97:24–98:1. Mr. McCormick stated Mr. VanNorstrand responded, "You didn't call Travis, so he's your supervisor and you needed to call him instead of Ries or Jeff." *Id.* at 98:1–3. Mr. VanNorstrand's response implies that there was at least one other known, reasonable and customary procedure for requesting OFLA leave—ask your supervisor for OFLA leave. This raises a triable issue of fact as to whether Mr. McCormick did in fact let Travis Smith know he would miss work on April 5, as Mr. McCormick testifies elsewhere that he did, or whether informing Ries Thorne and Jeff Koffed that he would miss work on April 5 was acceptable given that they were his weekend supervisors. Because this is a necessary fact for adjudicating Mr. McCormick's Fourth Claim and because it is in dispute,

summary judgment is inappropriate. CCI's Motion for Summary Judgment [29] is denied with regards to Mr. McCormick's Fourth Claim.

**B.** *Disability Discrimination Claim*

To prevail on his Fifth Claim, Mr. McCormick must prove that: (1) CCI is a covered employer with at least 6 employees; (2) Mr. McCormick has a disability or is regarded as having a disability; and (3) CCI discriminated against him or failed to provide a reasonable accommodation to him on the basis of his disability or perceived disability. ORS 659A.104– 659A.121. Mr. McCormick's claim is dead on arrival. In his deposition, Mr. McCormick clearly stated that he did not consider himself disabled nor did anyone at CCI perceive him as disabled at the time he was terminated. Mr. McCormick stated:

> Q.    Did [CCI] ever treat you as if you were disabled in some way?
>
> A.    No.
>
> Q.    Did you get the impression that anyone at Cable Communications, Inc., thought you were disabled in some way?
>
> A.    Not to my impression, no.
>
> . . .
>
> Q.    Did you consider yourself to be disabled at the time you can back to work?
>
> A.    I did not. I just considered myself to be weak, a little bit weaker in the stomach.

*McCormick Depo.*, 71:24–72:5; 99:9–12. Mr. McCormick fails to provide any response in his briefing as to why the Court should ignore or discount these statements (e.g. explaining away this statement by arguing Mr. McCormick did not understand the legal definition for the term "disabled"). Given these statements, Mr. McCormick's discrimination claim is fatally flawed; he cannot prove that he was disabled or that he was regarded as disabled. CCI's Motion for Summary Judgment [29] is granted as to Mr. McCormick's Fifth Claim.

C.      *Wrongful Termination Claim*

Mr. McCormick's Sixth Claim is a common law wrongful termination claim. In order to prevail on this claim, Mr. McCormick must prove that his termination was caused by his exercise of a job-related right that reflects important public policy. *See Babnick v. Oregon Arena Corp.*, 333 Or. 401, 407 (2002). CCI concedes that to the extent Mr. McCormick's claim is based on the public policy evidenced by the OFLA and the FMLA, he has a potentially viable wrongful termination claim. CCI argues, however, that Mr. McCormick's wrongful termination claim is fatally flawed because he cannot prove that: (1) he exercised his job-related medical leave rights; and (2) exercising those rights is what caused him to be terminated.

In support of this first deficiency, CCI again relies on the fact that Mr. McCormick failed to provide any of the supporting documentation CCI believes was necessary for him to request OFLA leave. For the reasons discussed above, I reject CCI's first alleged deficiency. There is a genuine dispute of material fact regarding whether or not Mr. McCormick properly invoked his rights under the OFLA. Therefore, this alleged deficiency is not a proper basis for granting summary judgment.

In support of its second deficiency, CCI points to the following portion of Mr. McCormick's deposition:

Q.      Did you think he was firing you for not showing up on Saturday?

A.      Yes.

Q.      Did you think there was any other reason why he was firing you?

A.      No.

*McCormick's Depo.*, 96:18–23. CCI argues that this is an admission from Mr. McCormick that it was his absence on Saturday that led to his termination and not the fact that he had invoked his

OFLA medical leave rights. But this is parsing his response too finely. It is perfectly reasonable to believe that a layperson in Mr. McCormick's shoes would think that answering "Yes" to the first question would be interpreted as "Yes. I was fired for not showing up on Saturday when I was on medical leave." It is also perfectly reasonable to believe that a layperson in Mr. McCormick's shoes would think that answering "No" to the second question would be interpreted as "No. I was only fired for using medical leave on Saturday." I therefore reject the argument that this "admission" forecloses Mr. McCormick from proving causation. Assuming Mr. McCormick can prove that he properly requested medical leave *ipso facto* causation is satisfied. The chain of causation would be as follows: (1) Mr. McCormick was absent from work on Saturday because he was exercising his job-related right to medical leave; (2) he was fired for being absent from work on Saturday; and (3) therefore he was fired because he exercised his job-related right to medical leave. I therefore reject CCI's second alleged deficiency with this claim.

For the foregoing reasons, CCI has failed to show that it is entitled to summary judgment regarding this claim. Therefore, CCI's Motion for Summary Judgment [29] is denied with regards to Mr. McCormick's Sixth Claim.

## CONCLUSION

For the foregoing reasons, Mr. McCormick's Motion for Partial Summary Judgment [26] is DENIED and CCI's Motion for Summary Judgment [29] is GRANTED in part and DENIED in part. Mr. McCormick's First, Second, Third and Fifth Claims are DISMISSED.

IT IS SO ORDERED.

DATED this __9th__ day of July, 2015.

/s/ Michael W. Mosman ____
MICHAEL W. MOSMAN
United States District Judge